IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| JAMES RUSSELL CHANDLER, SR., § <br> Plaintiff, § <br> § <br> v. § <br> § <br> ANDREW SAUL, § <br> COMMISSIONER OF SOCIAL § <br> SECURITY ADMINISTRATION, § <br> Defendant. § | <br><br><br>Civil Action No. 3:19-CV-1266-BH<br><br><br><br><br>Consent Case[1] |

## MEMORANDUM OPINION AND ORDER

James Russell Chandler, Sr. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (docs. 1, 19). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

On September 13, 2016, Plaintiff filed his application for DIB, alleging disability beginning on October 10, 2010. (doc. 12-1 at 154.)[2] His claim was denied initially on March 20, 2017 (*Id.* at 90), and upon reconsideration on July 10, 2017 (*id.* at 98). On September 1, 2017, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 100.) He appeared and testified at a video hearing on June 19, 2018. (*Id.* at 34.) On August 24, 2018, the ALJ issued a decision finding him not disabled. (*Id.* at 15.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on September 10, 2018.

---

[1]By consent of the parties and order filed August 28, 2019 (doc. 16), this matter has been transferred for the conduct of all further proceedings and the entry of judgment.

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

(*Id.* at 152.) The Appeals Council denied his request for review on March 27, 2019, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 4.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

A.   **Age, Education, and Work Experience**

Plaintiff was born on November 9, 1961, and was 56 years old at the time of the hearing. (doc. 12-1 at 38.) He had completed two years of college and could communicate in English. (*Id.* at 39.) He had past relevant work as an automotive mechanic. (*Id.* at 55.)

B.   **Medical, Psychological, and Psychiatric Evidence**

On October 27, 2010, Plaintiff was admitted to Hunt Regional Medical Center (Hunt RMC) with injuries to his head, neck, and back, after being involved in a motor vehicle accident. (*Id.* at 236.) He was assessed with thoracic and cervical strains, prescribed Baclofen and Tramadol, and discharged in stable condition. (*Id.* at 237-38.)

On November 1, 2010, Plaintiff returned to Hunt RMC with moderate neck pain. (*Id.* at 241.) His physical examination findings had improved, and his symptoms were "much better." (*Id.* at 243.) He was assessed with upper back spasm and prescribed ibuprofen 600mg and Flexeril. (*Id.*)

From November 3, 2010, through April 12, 2011, Plaintiff presented to Johnson Chiropractic for treatment for headaches, neck pain, and middle-back and low-back pain. (*Id.* at 246-94, 480-86). He reported a constant, sharp, hot-feeling pain in the neck that radiated to the upper back and into both shoulders, but worse on the right, with severe headaches. (*Id.*) He also had constant sharp pain in his middle and lower back that radiated into the left hip, and difficulty sleeping since the accident due to pain, discomfort, and sleep anxiety. (*Id.* at 485.)

On November 10, 2010, Plaintiff established pain management care with Erin Z. Silav, M.D.

(*Id.* at 321-326).  He reported neck and shoulder pain of 8 out of 10, and that most of his daily activities were limited because they exacerbated his pain. (*Id.* at 321-22.) On examination, Plaintiff had cervical paravertebral tenderness and showed decreased range of motion of the cervical spine. (*Id.* at 324-25.) He denied numbness, depression, anxiety, or suicidal ideations, and mental status and mood-behavior examinations were within normal limits. (*Id.*)  Dr. Silav assessed chronic pain due to trauma, cervicalgia, occipital neuralgia, and myalgia. (*Id.* at 325.)  She opined that Plaintiff's chronic pain was a result of intricate and dynamic interaction among biological, psychological, and social factors, and she refilled his prescriptions for Tramadol and Flexeril. (*Id.* at 326.)

A cervical spine X-ray dated November 24, 2010, showed mild to moderate multilevel cervical spondylosis, a C4-C5 disc protrusion abutting the ventral cord, C6-C7 spondylosis with moderate right foraminal stenosis possibly impinging the C7 nerve root, and mild to moderate foraminal narrowing due to spondylosis at the C7-T1 level. (*Id.* at 300.)  Dr. Silav administered occipital nerve blocks on November 10, November 30, and December 8, 2010. (*Id.* at 327-29.)  She also administered cervical medial branch blocks on January 12, January 26, February 8, February 16, and March 1, 2011. (*Id.* at 330-39.)

On March 15, 2011, Plaintiff returned to Dr. Silav with constant neck pain of 6 out of 10 that radiated into his right shoulder. (*Id.* at 340.)  His musculoskeletal and neurologic examinations were the same, and he was negative for severe anxiety or depressive affect. (*Id.* at 340-41.)  Dr. Silav recommended a neurosurgical evaluation because his current treatment was no longer helping, and she continued his medications. (*Id.* at 341.)

On April 12, 2011, Plaintiff presented to Dr. Darlene Johnson for his final chiropractic session. (*Id.* at 485-86.)  He reported that he was improved by 70 percent, and that his pain was at

3

a 5 to 6 out of 10. (*Id.* at 486.)  Dr. Johnson's prognosis was guarded; she noted that Plaintiff responded well to conservative chiropractic care with his mid and lower back, but his neck and shoulder continued to cause pain and discomfort. (*Id.*)  She opined that future exacerbations were likely with increased activity due to the trauma to his neck and shoulder, and she recommended treatment be continued on an as-needed basis. (*Id.*)

On April 21, 2011, Plaintiff presented to Richard A. Marks, M.D., with neck and shoulder pain. (*Id.* at 343-44.)  Dr. Marks noted that a recent cervical MRI scan showed a C6-C7 disc protrusion with moderate foraminal stenosis, as well as a C7-T1 disc bulge with moderate to severe foraminal stenosis. (*Id.* at 343.)  He also noted that a right shoulder MRI showed fraying of the supraspinatus tendon and high grade partial tear of the supraspinatus tendon, with osteoarthritis of the glenohumeral joint and possible tears of the labrum. (*Id.*)  Dr. Marks recommended a shoulder surgeon consultation and physical therapy; he advised Plaintiff to see a shoulder surgeon from a state hospital given his financial difficulties. (*Id.* at 343-44.)

On May 9, 2011, Plaintiff presented to orthopaedic surgeon, Richard S. Levy, M.D., for right shoulder evaluation. (*Id.* at 432-33.)  He reported pain with any overhead use of the right arm, and rated his pain a 7 out of 10. (*Id.* at 432.)  He had a normal mental status examination, with no depression or disturbance of mood or affect. (*Id.* at 432-33.)  Dr. Levy assessed right shoulder Type II SLAP tear and high grade partial thickness rotator cuff tear. (*Id.* at 433.)

On September 7, 2011, Dr. Levy performed an arthroscopic glenohumeral debridement, SLAP lesion repair, subacromial decompression and bursectomy, and rotator cuff repair. (*Id.* at 434-36.) From September 12, 2011, through August 31, 2012, Plaintiff presented to Dr. Levy for follow-up visits. (*Id.* at 437-43.)  At his final appointment on August 31, 2012, Dr. Levy noted that

4

Plaintiff's right shoulder had progressed "quite well" ten months post-surgery, but that he continued to be limited due to radiculopathy and migraine headaches. (*Id.* at 443.)

Plaintiff presented to Kaufman Community Health Center and was treated for testicular pain on June 20, 22, and 28, 2016; for orchitis on July 13, 2016; and for urinary urgency and frequency with groin, lower back, and abdominal pain on August 4, 2016. (*Id.* at 367-405.)  At each appointment, he denied feeling down, depressed, or hopeless, and was negative for having little interest or pleasure in doing things. (*Id.*)

On August 31, 2016, Plaintiff presented to William A. Elfarr, M.D., with continuing left testicle pain and swelling, and an enlarged prostate. (*Id.* at 408-11).  On examination, he was well-oriented to time, place, and person; his mood indicated no abnormalities; and he did not appear depressed or agitated. (*Id.* at 410.)  Dr. Elfarr noted moderately tender enlargement of the entire left epididymis, assessed epididymitis, and started Plaintiff on Bactrim. (*Id.* at 410-11.)  Plaintiff reported improved symptoms at a follow-up appointment with Dr. Elfarr on September 21, 2016, and was continued on Bactrim. (*Id.* at 413-17.)

On February 6, 2017, Robin Rosenstock, M.D., a state agency medical consultant (SAMC), completed a physical Residual Functional Capacity (RFC) assessment based on the medical evidence. (*Id.* at 66-68.)  She opined that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and push and/or pull without limitations, other than shown for lift and/or carry, with no postural, manipulative, visual, or communicative limitations. (*Id.* at 67.)  She determined that Plaintiff's alleged severity of symptoms was partially consistent with the evidence of record, but that the impact of his symptoms did not "wholly compromise the ability to function

5

independently, appropriately, and effectively on a sustained basis." (*Id.* at 66.) SAMC William Harrison, M.D., affirmed Dr. Rosenstock's physical RFC assessment on June 28, 2017. (*Id.* 81-82.)

On March 1, 2017, Plaintiff presented to Ashley Gartner, Psy.D., for a consultative mental status examination. (*Id.* at 420-27.) He reported depression and anxiety since his motor vehicle accident in 2010, and that he was no longer able to enjoy his usual activities due to migraines, pain, and restricted movement. (*Id.* at 420-21.) He was not taking any medication prescribed for him because he "[could not] afford to see a doctor." (*Id.* at 421.) Dr. Gartner diagnosed major depressive disorder, recurrent, severe; generalized anxiety disorder; and panic disorder, with a guarded prognosis. (*Id.* at 426.) She opined that Plaintiff would have difficulty understanding and remembering instructions due to anxiety-related thoughts, and that his neck and shoulder pain would hinder his ability to carry out instructions. (*Id.*) She also opined that he could not sustain concentration or persist in work-related activity at a reasonable pace due to anxiety, racing thoughts, panic attacks, and low energy; that he would have difficulty maintaining appropriate social interactions with supervisors, coworkers, and the public; and that he could not handle stress and would be overwhelmed when faced with pressure in a work environment. (*Id.*) Dr. Gartner concluded that Plaintiff's symptoms were likely to persist and would hinder his ability to function in social and occupational contexts. (*Id.*)

On March 16, 2017, State Agency Psychological Consultant (SAPC), Jean Germain, Ph.D., completed a Psychiatric Review Technique (PRT) for Plaintiff. (*Id.* at 64-70.) She found that Plaintiff had severe medically determinable impairments, including depressive, bipolar and related disorders and anxiety and obsessive-compulsive disorders, but that his alleged limitations were only partially supported by the medical evidence. (*Id.* at 64.) Dr. Germain opined that he had moderate

6

limitations in understanding, remembering, or applying information; in interacting with others; in concentrating, persisting, or maintaining pace; and in adapting or managing onself. (*Id.* at 65.) She determined that Plaintiff was markedly limited in the abilities to understand and remember detailed instructions and to carry out detailed instructions. He was moderately limited in the abilities to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (*Id.* at 68-70.) Dr. Germain also completed a mental RFC assessment and found that Plaintiff retained the mental capabilities to understand, remember, and carry out simple instructions; make simple decisions; concentrate for extended periods; interact with others; and respond to changes. (*Id.* at 70.)

On April 1, 2017, Plaintiff presented to Hunt RMC after twisting his left ankle. (*Id.* at 453-54.) On examination, there was moderate tenderness, mild swelling and small ecchymosis, and limited range of motion of the left ankle. (*Id.* at 454.) He was assessed with closed non-displaced left lateral malleolus fracture, and was discharged in good and stable condition. (*Id.*)

On June 28, 2017, Margaret Podkova, Ph.D., another SAPC, reviewed the medical evidence and completed a mental RFC that mirrored Dr. Germain's mental RFC. (*Id.* at 79-85.) She also affirmed Dr. Germain's opinion that Plaintiff's alleged limitations were not fully supported by the medical evidence. (*Id.* at 84-85.)

On April 11, 2018, Plaintiff underwent a functional capacity evaluation at Hulsey Therapy Services. (*Id.* at 457-76.) He was unable to perform a majority of testing components to completion

7

because of severe pain and decreased use of his right upper extremity and right leg. (*Id.* at 458.) The evaluator noted that Plaintiff demonstrated "below normal range of motion and cervical spine, lumbar spine, and right upper and lower extremities," but it was difficult to make a determination about his functional status based on the incomplete testing components. (*Id.*)

**C.     Hearing**

On June 19, 2018, Plaintiff and a vocational expert (VE) testified at a video conference hearing before the ALJ. (*Id.* at 34-59.) Plaintiff was represented by an attorney. (*Id.* at 36.)

   *1.     Plaintiff's Testimony*

Plaintiff testified that his disability was the result of a vehicle accident that occurred on October 10, 2010. (*Id.* at 38.) He sustained multiple injuries, including a messed-up back, four broken discs in his neck, and a broken collarbone, and all the muscles in his shoulder were ripped loose. He had not been able to work since the accident. (*Id.* at 41.) He had constant migraine headaches, could not bend or stoop, and was unable to look up. (*Id.*) He could not lift more than five pounds and would be "down for a couple of days" after lifting anything. (*Id.* at 42.) He had limited motion of his right shoulder and could not reach overhead, and his right hand would go numb after carrying something like a dinner plate. (*Id.* at 42-43.) He was right-handed and could not hold the tools he used at work because his right hand would go numb. (*Id.* at 43.) Plaintiff experienced migraine headaches daily and would have to spend time in a dark room almost every day. (*Id.* at 44-45.) He could not bend over at the waist, and his girlfriend would need to help him wash his hair. (*Id.* at 45.) He was unable to help around the house and did not participate in social activities. (*Id.* at 46.) He had trouble sleeping because he could not get comfortable; he could be on his feet about ten minutes and could not sit in an office chair very long due to back, neck, and shoulder pain. (*Id.*

8

at 48.) His pain level was an eight out of ten without activity and would increase above a ten with activity. (*Id.* at 49.) He was unable to stay on task or concentrate due to his pain. (*Id.* at 49-50.) He did not receive a lot of medical treatment since his right-shoulder surgery in 2012 because he did not have money or insurance. (*Id.* at 52.) He went to physical therapy for two months after the surgery, but was told to stop because his arm started going numb. (*Id.* at 54.)

    2.    *VE's Testimony*

The VE testified that Plaintiff had previous work experience as an automotive mechanic, which was medium work with a SVP of 7. (*Id.* at 56.) A hypothetical person with the same age, education, and work experience history as Plaintiff, who could lift and carry 50 pounds occasionally and 25 pounds frequently; stand or walk and sit six hours a day with normal breaks; push and pull the same as lift and carry, with no overhead reaching with the right upper extremity; understand, remember, and carry out simple, routine, and repetitive tasks and instructions; make simple work decisions; and attend and concentrate on simple tasks within periods of normal breaks, with interpersonal contact incidental to the work performed, could not perform his past work. He could perform medium, SVP-2 level work, including a retail stocker with 113,120 jobs nationally, a hand packer with 93,170 jobs nationally, and a laboratory glass cleaner with 130,790 jobs nationally, all of which were consistent with the DOT. (*Id.* at 56-57.) If limited to unskilled work with the lifting and carrying requirement lowered to 20 pounds occasionally and 10 pounds frequently, he could perform light, SVP-2 level work, including mail clerk with 99,190 jobs nationally, a garment bagger with 112,312 jobs nationally, and a pencil sorter with 117,883 jobs nationally. (*Id.* at 58.) A person off-task for 10 percent of the workday would be precluded from all work. (*Id.*)

9

**D.     ALJ's Findings**

The ALJ issued a decision denying benefits on August 24, 2018. (*Id.* at 15.) At step one, he found that Plaintiff had met the insured status requirements through December 31, 2016, and had not engaged in substantial gainful activity since the alleged onset date of October 10, 2010. (*Id.* at 20.) At step two, the ALJ found that he had the following severe impairments: spine disorder, history of dysfunction of a major joint, affective disorder, and anxiety disorder. (*Id.* at 21.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 24.)

Next, the ALJ determined that Plaintiff retained the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), with the following limitations: lift and carry up to 50 pounds occasionally and 25 pounds frequently; walk or stand six hours of an eight-hour day; sit six hours of an eight-hour day; never overhead reach with the right upper extremity; be limited to simple, routine, and repetitive tasks and instructions; make simple work decisions; attend and concentrate on simple tasks for extended periods with normal breaks; and adapt to changes in a routine work setting, with interpersonal contact incidental to the work performed. (*Id.* at 26.) At step four, the ALJ determined that Plaintiff was unable to perform his past work. (*Id.* at 27.) At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled whether or not he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id.* at 28.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the

Social Security Act, at any time from October 10, 2010, through December 31, 2016, the date last insured. (*Id.* at 29.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.*  The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See Id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as

11

defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step

12

five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1. The ALJ's mental RFC finding is not supported by substantial evidence.

2. The ALJ erred in failing to consider the reason for Plaintiff's lack of treatment.

(doc. 19 at 4.)

**A.     RFC Assessment**

Plaintiff argues that the ALJ's mental RFC assessment is not supported by substantial evidence. (doc. 19 at 11-14.) He also claims that "the ALJ determined [his] mental RFC by drawing his own medical conclusions based upon the reported objective medical findings." (doc. 19 at 11.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should

13

be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

In *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), the claimant argued that the ALJ failed to

14

develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so the ALJ's RFC determination was not supported by substantial evidence. *Id.* The Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557-58. Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27; *see also Oderbert v. Barnhart*, 413 F. Supp.2d 800, 803 (E.D. Tex. 2006) ("*Ripley* clarifies that an [ALJ] cannot determine from raw medical data the effects of impairments on claimants' ability to work.").

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the following mental RFC: perform simple, routine, and repetitive tasks and instructions; make simple work decisions; attend and concentrate on simple tasks for extended periods with normal breaks; and adapt to changes in routine work setting, with interpersonal contact incidental to the work performed. (doc. 12-1 at 26.) He expressly considered the medical opinions of Dr. Gartner, and gave partial weight to her opinion that Plaintiff's symptoms were likely to persist and hinder his ability

15

to function in social and occupational contexts because it was not expressed in vocational terms with specific limitations. (*Id.* at 27.) He also attributed little weight to Dr. Gartner's other functional capacity limitations, explaining "these were based on the subjective reports of the claimant, and did not appear to be additional opinions pertaining to the claimant's residual functional capacity." (*Id.*) The ALJ gave great weight to the opinions of the SAMCs and SAPCs finding them consistent with the medical evidence, which includes Dr. Germain's mental RFC assessment that Plaintiff was limited to understanding, remembering, and carrying out simple instructions; making simple decisions; concentrating for extended periods; interacting with others; and responding to changes. (*Id.* at 27, 70.) This is consistent with the ALJ's mental RFC determination that Plaintiff could perform simple, routine, and repetitive tasks and instructions; make simple work decisions; attend and concentrate on simple tasks for extended periods with normal breaks; and adapt to changes in routine work setting, with interpersonal contact incidental to the work performed. (*See id.* at 26.)

Because his RFC determination was based on specific medical opinions, the ALJ in this case did not rely on his own lay opinion in violation of *Ripley*. *See, e.g., Young v. Berryhill*, No. 3:15-CV-3742-M (BH), 2017 WL 946323, at *12 (N.D. Tex. Feb. 13, 2017), *adopted by* 2017 WL 931228 (N.D. Tex. Mar. 9, 2017) ("Because the ALJ relied on the medical opinions of Dr. Fletcher to determine Plaintiff's limitations, he did not independently decide the effects of Plaintiff's impairments."); *see cf. Johns v. Colvin*, No. 3:13-CV-4420-N-BH, 2015 WL 1428535, at *18-20 (N.D. Tex. Mar. 30, 2015) (finding *Ripley* error where there were no medical opinions regarding the effects the claimant's impairments). Remand is not required on this basis.

**B.     Inability to Afford Treatment**

Plaintiff argues that the ALJ failed to properly consider his inability to afford medical

16

treatment to account for the lack of consistent treatment after 2012. (doc. 19 at 15-17.)

In order to receive benefits, Social Security claimants must follow treatment prescribed by a physician; a failure to do so, without good reason, will lead to a finding that the claimant is not disabled. *See* 20 C.F.R. §§ 404.1530(a), (b). Failure to seek treatment is relevant in determining whether disability exists and is an indication of nondisability. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). Impairments that can be remedied or treated by medication will not be considered a disability. *See Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988). When a "claimant cannot afford the prescribed treatment or medicine, and can find no way to obtain it, [however,] 'the condition that is disabling in fact continues to be disabling in law.'" *Lovelace*, 813 F.2d at 59 (quoting *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986)). Further, an ALJ "will not find an individual's symptoms inconsistent with the evidence in the record . . . without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints," including that "[a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services." SSR 16-3p, 2016 WL 1119029, at *9-10 (S.S.A. Mar. 16, 2016).

Here, Plaintiff testified that he had not had much medical treatment since 2012 because he did not have money and health insurance. (*See* doc. 12-1 at 52.) An inability to afford treatment by itself is insufficient, however. *Lovelace*, 813 F.2d at 59. A claimant must also show that he could not obtain medical treatment from other sources, such as free or low-cost health clinics. *See id.* (explaining that a condition is disabling in law if a "claimant cannot afford prescribed treatment or medicine, *and* can find no way to obtain it") (emphasis added); SSR 16-3p, 2016 WL 1119029, at *10 (alleged symptoms may be consistent with claimant's infrequent treatment history based on

evidence that claimant "may not be able to afford treatment *and* may not have access to free or low-cost medical services") (emphasis added); *see also* SSR 82-59, 1982 WL 31384, at *4 (S.S.A. Jan. 1, 1982) (explaining that to show claimant's failure to follow prescribed treatment was "justifiable" on grounds of inability to afford treatment, "[a]ll possible resources (e.g., clinics, charitable and public assistance agencies, etc.), must be explored," and "[c]ontacts with such resources and the claimant's financial circumstances must be documented"). Plaintiff did not provide any evidence to show that he lacked access to free or low-cost medical services. *See Rodriguez v. Comm'r of Soc. Sec. Admin.*, No. CIV A 706-CV-151-BH, 2008 WL 1958985, at *8 (N.D. Tex. Apr. 29, 2008) (citing *Lovelace*, 813 F.2d at 59) ("Although Plaintiff indicated that she was not always able to afford her medication or the cost of doctor's visits, [ ] Plaintiff presented no evidence that she exhausted free or low cost medical care alternatives."); *see, e.g., Kinan F. v. Saul*, No. 2:19-CV-88-Z-BR, 2020 WL 5930626, at *3 (N.D. Tex. June 19, 2020), *adopted by* 2020 WL 4188066 (N.D. Tex. July 21, 2020) ("Plaintiff makes conclusory statements that he cannot 'afford or obtain' treatment [ ], but does not explain why he could not obtain medical treatment from other sources, such as free or low-cost medical services, much less provide any such evidence."); *Anderson v. Comm'r of Soc. Sec.*, No. 3:17-CV-363-DPJ-JCG, 2018 WL 3978610, at *5 (S.D. Miss. July 25, 2018), *adopted by* 2018 WL 3977977 (S.D. Miss. Aug. 20, 2018) ("The record contains no evidence that Plaintiff attempted to obtain treatment and was denied such treatment because of insufficient funds or insurance."). Because Plaintiff has not shown that he did not have access to free or low-cost medical services, the requirement that the ALJ consider his inability to pay for medical treatment does not apply. *See Lovelace*, 813 F.2d at 59. Remand is therefore not required on this issue.

## IV. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** on this 27th day of October, 2020.

                                                  IRMA CARRILLO RAMIREZ
                                          UNITED STATES MAGISTRATE JUDGE